**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KEVIN HENRY and NAJEH DAVENPORT, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Civil Action No. 20-4165<br><br>Complaint – Class Action |

**CLASS ACTION COMPLAINT FOR MONEY DAMAGES**

Plaintiffs Kevin Henry and Najeh Davenport, individually and on behalf of all others similarly situated, complain and allege as follows:

**Preliminary Statement**

1. This is an action on behalf of Black members of the Settlement Class as defined in the June 23, 2014 Settlement Agreement (as amended on Feb. 13, 2015) in *In re: National Football League: Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.) (the "MDL Proceeding" and the "Settlement Agreement").[1] As administered, the Settlement Agreement is marred by an unacceptable flaw: the National Football League and NFL Properties, LLC (collectively, "the NFL") have been avoiding paying head-injury claims under the Settlement Agreement based on a formula for identifying qualifying diagnoses that explicitly and deliberately

---

[1] This is a related case to the MDL Proceeding within the meaning of E.D. Pa. L.R. 40.1. The same representative plaintiffs are today also filing a Motion for Relief under Article XXVII of the Settlement Agreement.

discriminates on the basis of race. When being evaluated for the Qualifying Diagnoses of Neurocognitive Impairment, Black former players are automatically assumed (through a statistical manipulation called "race-norming") to have started with worse cognitive functioning than White former players. As a result, if a Black former player and a White former player receive the exact same raw scores on a battery of tests designed to measure their current cognitive functioning, the Black player is presumed to have suffered less impairment, and he is therefore less likely to qualify for compensation. The effects of race-norming "can be extremely consequential, and the adjustments may often make the difference in a clinician's determination of cognitive impairment . . . for Retired NFL Players seeking benefits under the Agreement." Decision of Special Masters Regarding Najeh Davenport at 7 (Aug. 20, 2020) ("SM Decision").

2. The NFL's actions were designed to, and did, make it far more difficult for Black retirees to receive benefits for the brain injuries which are a routine result of playing pro football. But even in cases where the Defendants' actions did not prevent Black retirees from receiving benefits, those actions harmed every member of the proposed class by subjecting them to intentional discrimination on the basis of race.

3. Although racial categorizations can be arbitrary, several estimates place the proportion of current pro football players who are Black at 65-70%. On information and belief, a majority of the Settlement Class can also be identified as Black. The NFL's scheme – executed through the League-sponsored Settlement Agreement – is particularly insidious because it presumes Black retirees to be less intelligent than their non-Black fellow retirees.

4. The NFL's enforcement of the Settlement Agreement treats the League's Black retirees as second-class citizens, or worse, by presuming that their pre-football cognitive abilities were lower than those of their White teammates. This presumption of inferiority is then used to

explain away and to avoid paying compensation for Black retirees' post-football neurocognitive shortfalls. In this way, the NFL has ensured that fewer Black retirees will receive benefits under the Settlement Agreement. Yet even in cases where Black retirees surmount the obstacle erected by the NFL, and receive benefits, those retirees are subjected to the same discriminatory acts by the League, through the manipulation of their cognitive testing scores.

5. On information and belief, the NFL expected and intended this result in drafting, interpreting, and enforcing the Settlement Agreement. Simply stated, the League sought to reduce the total cost of benefits paid to the Settlement Class, by greatly reducing benefits to the Black retirees who today make up a majority of both the Settlement Class and the NFL's workforce.

## Parties

6. Plaintiff Kevin Henry, a Black retiree, played in the NFL for eight years between 1993 and 2000, all for the Pittsburgh Steelers, retiring at the age of 33. During his playing career, Mr. Henry suffered multiple concussions, at least one of which was severe enough to cause him to miss playing time. Since retirement, Mr. Henry has suffered from persistent headaches, depression, emotional volatility, memory loss and impaired cognitive ability. These symptoms have left Mr. Henry unable to hold a job for the past eight years, and increasingly unable to perform the activities of daily living. Pursuant to the Settlement Agreement, on August 2, 2017, Mr. Henry received a neurological examination by a Monetary Award Fund ("MAF") Physician. The MAF Physician concluded that Mr. Henry's test scores qualified him for Level 1.5 Neurocognitive Impairment in one domain (executive functioning), and for Level 2 Neurocognitive Impairment in two domains (learning and memory, and language). Nonetheless, Mr. Henry's claim for benefits was denied. On December 5, 2019, Mr. Henry received a second neurological evaluation under the Settlement Agreement. This time, the evaluating clinician adjusted Mr. Henry's raw scores

using a "Full Demographic Model . . . which includes age, education, race/ethnicity, and gender." The clinician determined that Mr. Henry's test scores did not qualify him for Level 1.5 or Level 2 Impairment in any category. In explaining the discrepancy with the prior round of testing, the clinician wrote: "different normative comparison [*i.e.*, race] groups were used at the previous evaluation, which also may account for some discrepancies in the standard scores and meeting impairment criteria." Mr. Henry intends to make an additional, future application for benefits under the Settlement Agreement.

7. Plaintiff Najeh Davenport, a Black NFL retiree, played in the League for seven years between 2002 and 2008 for the Green Bay Packers, Pittsburgh Steelers, and Indianapolis Colts, retiring at the age of 29. During his playing career, Mr. Davenport suffered over 10 concussions, one of which was associated with an orbital fracture and loss of consciousness. After multiple episodes of head impact, Mr. Davenport experienced ringing in his ears, double vision, headaches, and photophobia. Since retirement, Mr. Davenport has suffered from memory loss, progressive cognitive decline, and depression, and is unable to perform basic household chores. Pursuant to the Settlement Agreement, Mr. Davenport received a neurological evaluation by a MAF Physician on November 5, 2019. Without adjusting his raw scores based on a Black-specific reference population, the MAF Physician concluded that Mr. Davenport's test scores qualified him for Level 1.5 Neurocognitive Impairment in one domain (executive functioning), and for Level 2 Neurocognitive Impairment in another domain (language). Mr. Davenport received a Notice of Monetary Award from the Claims Administrator indicating that he would receive compensation. But the NFL appealed Mr. Davenport's claim determination, arguing in part that, "based on the NFL Parties' independent re-calculation of Mr. Davenport's" scores, and "applying the industry standard Heaton [*i.e.*, race-based] norms, Mr. Davenport did not demonstrate the requisite

cognitive impairment in *any* domain." (Emphasis in original). As the NFL put it, the use of racial norms would have "materially and critically affected the outcome of Mr. Davenport's claim." On August 20, 2020, the Special Master issued a decision in the NFL's appeal of Mr. Davenport's monetary award, observing that there was "no clear indication as to how any demographic adjustments factored into Mr. Davenport's . . . scores." SM Decision at 11. The Special Master therefore remanded the case to the Claims Administrator to determine whether the neuropsychologist's reasons not to use the Black reference population norms overcame what the Special Masters determined was the presumption that Black players would be assessed using Black population norms.. SM Decision at 12.

8. Defendant the National Football League is the largest sports league in the United States as well as the world, with annual revenue in 2018 of $14.5 billion. It is an unincorporated association headquartered in New York and organized under the laws of New York. The NFL transacts business throughout the United States as well as abroad, and is a party to the Settlement Agreement.

9. Defendant NFL Properties LLC is a Delaware limited liability company headquartered in New York. It is a wholly owned subsidiary of NFL Ventures, L.P., a Delaware limited partnership. NFL Properties LLC is a party to the Settlement Agreement.

## Venue and Jurisdiction

10. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Both Defendants are subject to personal jurisdiction in this Court because they both do business in this District, and because the MDL Proceeding was filed and continues to be active here. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events

or omissions giving rise to the claim occurred here, and likewise because the MDL Proceeding was filed and continues to be active here.

## Statement of Facts

**A. The MDL Settlement Agreement and the Settlement Class**

11. In 2011, after learning of the deaths of former players from a form of dementia induced by repeated brain trauma, retired NFL players began filing personal injury actions in courts around the country seeking damages or relief in the form of medical monitoring. Some of these actions were filed on behalf of a class, some for small groups of former players, and others for individuals. The NFL successfully removed cases from state court on the theory that adjudication of the claims required interpretation of its collective bargaining agreement and was preempted by federal labor law. The Judicial Panel on Multidistrict Litigation (JPML) consolidated the cases for pretrial proceedings before this Court in the Eastern District of Pennsylvania, No. 2:12-md-02323-AB.

12. The parties settled before engaging in substantial discovery. The Court refused to approve the initial settlement because the agreement included a cap on the NFL's payment obligations, creating a conflict between the interests of present and future claimants. After the parties revised the agreement to make it "uncapped," the Court granted class certification and approved the Settlement Agreement, and both rulings were affirmed by the Third Circuit.

13. All retired NFL players who did not opt out by August 2014 are members of the Settlement Class. According to the official website maintained by the settlement administrator, as of August 1, 2020, there are 20,555 registered class members and 1170 payable monetary awards: www.nflconcussionsettlement.com. A majority of the Settlement Class is Black.

14.     Under the Settlement Agreement, a former player who has a "Qualifying Diagnosis" is eligible for monetary benefits.  The Qualifying Diagnoses are: Level 1.5 Neurocognitive Impairment (moderate to severe decline/early or mild dementia); Level 2 Neurocognitive Impairment (severe decline/moderate dementia); Alzheimer's; Parkinson's; Amyotrophic Lateral Sclerosis (ALS); and for former players who died prior to the effective date of the Settlement but not after, Death with Chronic Traumatic Encephalopathy (CTE).  Diagnoses of those conditions qualify primarily – but not exclusively – if rendered by physicians approved by the NFL (a MAF Physician) or in conjunction with the NFL's Baseline Assessment Program (BAP).  The BAP is intended both to identify symptoms of eligible conditions and to collect data for comparison to later testing, to establish any subsequent decline in a retired player's cognitive functioning.  As of August 1, 2020, 12,180 Settlement Class members have attended BAP appointments.  Monetary awards under the Agreement go up or down based on Qualifying Diagnosis, age at the time of diagnosis, and number of NFL seasons (if fewer than five), among other factors.

15.     Claims for monetary awards are first reviewed by the Claims Administrator. Appeals of claims determinations are to the Court, but the Settlement established an Appeals Advisory Panel to assist in the review of contested claims. The Court has delegated its authority under the Agreement to review appeals to one or more Special Masters.  The Special Masters have adopted Rules to govern appeals.  The Special Master's conclusions of law are subject to *de novo* review by the Court.  The Special Master's decisions are otherwise final under the Court's appointment order.

### B. The NFL Has Exploited the Settlement Agreement to Encourage Overt Racial Discrimination

16. Exhibit A-2 to the Settlement Agreement identifies the neurological test battery to be administered and the "specific impairment criteria" used to satisfy the Qualifying Diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment. Exhibit A-2 also lays out the manner in which test results are to be used to assess overall cognitive functioning.

17. Section 4 of Exhibit A-2 provides: "There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4 or 6 demographically adjusted test scores for consideration." When arguing against compensation for Black former players in the claims administration process, the NFL has repeatedly argued that all "demographic adjustments" in retirees' scores must include adjustment by race.

18. Under the Settlement Agreement, a player's cognitive decline is assessed based on "and in accordance with the standardized neuropsychological testing protocol" in Exhibit A-2. Exhibit A-2 defines the required decline in terms of a statistical comparison of the former player's scores on the neuropsychological test battery with the scores of a reference population: "The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid [pre-injury] functioning." The "expected level of premorbid functioning" is considered to be the mean (the arithmetic average) of scores for the relevant population, and the level of decline equals the difference between the former player's scores and the mean scores. Those differences are translated to standard deviations by converting raw scores (the actual number of correct responses) to "T-scores" which are based on the reference population's mean and standard deviation.

19. Using a reference population with a lower mean makes it harder to qualify, because a lower present-day score is needed for a T-score the same distance below the mean. Because the NFL has insisted on using different reference populations for Black former players and White former players, in which the mean for Black players is lower than the mean for White players, it is harder for Black players to qualify than if all players were assessed on the basis of scores scaled from the same general population.

20. In litigating claims under the Agreement, the NFL has repeatedly insisted that applicants' scores must be "race-normed" by using separate Black and White reference populations – a position that greatly reduces Black players' chances of success. The NFL (in papers filed on behalf of both Defendants named here) has thus argued that a retired player can qualify for a monetary award only on the basis of a particular combination of scores on neuropsychological tests, and that these scores must be adjusted for the retired player's race. In support of this contention, the NFL has cited a notation in Exhibit A-2 to the Settlement Agreement that "Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African-Americans."

21. The NFL's claims administration papers have also cited and relied upon "Heaton, et al., Revised comprehensive norms for an expanded Halstead-Reitan Battery: Demographically adjusted neuropsychological norms for African American and Caucasian adults. Professional Manual (2004)." (This reference is to the work of Robert Heaton, who has gathered "race-normed" data of the type described above.)

22. In 2017, two years after the Settlement Agreement went into effect, the NFL and Class Counsel developed a Clinician's Interpretation Guide for the BAP ("the BAP Guide") that expressly urges clinicians to "correct" test scores based on a retired player's race. SM Decision

9

at 9. Specifically, the manual requires clinicians to "Convert test scores to demographically-corrected T-scores via ACS software (*use of the full demographic correction is recommended*) or Revised Comprehensive Norms for an Extended Halstead-Reitan Battery." *Id.* (emphasis added by Special Masters). In the ACS testing software, "full demographic correction" includes adjusting scores based on a player's race. And the mention of "Revised Comprehensive Norms" is a reference to the "Heaton norms." The BAP Guide was developed confidentially by the NFL and Class Counsel in "a collaborative and iterated process," SM Decision at 9, with *no* opportunity for Class members to be heard. The BAP Guide remains confidential.

23. In several instances, the NFL has referred to the race-based manipulation of Black players' scores as "industry-standard" and has asserted that BAP neuropsychologists "most commonly use" them. Citing the BAP Guide, the NFL has gone so far as to state that these norms "are mandated in the BAP," even though the Settlement Agreement does not say so.

24. More recently, when a Black retired player challenged the use of race-norming before the Appeals Advisory Panel, the NFL argued that race norms "can be used," even if they are not "mandated" under the Settlement Agreement, and advocated for their use in that player's case. Moreover, even in that particular case, the NFL argued that the presumption should be in favor of race-norming, and that any clinician who decided to calculate T-scores in a race-neutral manner must explicitly explain their decision *not* to engage in race-norming and must give a "clinically reasonable explanation" for not doing so. Regardless of variations in the NFL's language, the outcome has been the same: Black retirees' scores have been artificially manipulated, and the NFL has successfully challenged testing which does not use those race-based "norms."

25. The NFL has also advocated for race-based manipulation of scores when litigating individual claims before the Special Masters. The NFL has actively opposed testing that did *not*

employ race-norming, arguing that a retired player may only qualify for a monetary award on the basis of a particular combination of scores on neuropsychological tests, and that the scores should be adjusted for the retired player's race. For example, on August 3, 2020, the NFL argued that a Black retired player should not qualify for compensation, even though he had received qualifying test scores for Level 2 Impairment, in part because the evaluating clinician "corrected only for age (without providing any rationale for his decision not to use full *demographic* corrections)." (Emphasis added.) The NFL then proceeded to correct the player's scores "for age, education, *and ethnicity*" (emphasis added), which the NFL characterized as "the appropriate norms" for adjusting players' test scores.

26.  Upon information and belief, the consulting neuropsychologists involved in claims administration under the Settlement Agreement have accepted the NFL's position and applied the "race-normed" scores as being required by the Settlement testing protocol, even though they are not. For example, an October 2018 report by an Appeal Advisory Panel Consultant stated that: "The NFL settlement guidelines are very specific in requiring the use of the Heaton norms for several tests." And on June 15, 2020, a consulting psychologist working for the settlement administrator commented that a Black player's test scores that were *not* race-normed did "not comply[] with the language and intent of the settlement around demographic adjustments." Similarly, the 4/20/17 MAF Physician Manual prepared as part of settlement administration – and, upon information and belief, approved by the NFL – directly supports the use of race-norming.

## CLASS ACTION ALLEGATIONS

27.  Plaintiffs seek certification of a class pursuant to Fed. R. Civ. P. 23(b)(1), (2) and/or (3). That class is defined as follows:

Each individual who received testing under the Settlement Agreement as part of the Baseline Assessment Program, or in connection with his evaluation by any Qualified Monetary

11

Award Fund physician, and whose test results were subjected to any form of adverse adjustment based on that individual's status as Black or African-American.

28. The proposed class is numerous, because more than 12,000 Settlement Class member have received BAP testing (and, upon information and belief, several thousand have received MAF testing), and a majority of the Settlement Class members are Black.

29. Plaintiffs are adequate representatives of the class because they were subjected to the same racially discriminatory manipulation as other class members, have no conflicts of interest with the class, and have retained counsel knowledgeable as to both class actions and the subject matter of both the MDL Proceeding and the Settlement Agreement, as well as the underlying phenomenon of mild traumatic brain injury caused by pro football.

30. Several questions of law and fact are common to the class, including whether (1) the NFL's practices have caused the Agreement to be enforced in such a way that it is unequal to Black Settlement Class members, and (2) the NFL has deprived Plaintiffs of the full and equal benefit of the MDL Proceeding.

31. The proposed class meets the requirements of Rule 23(b)(1), because inconsistent or varying standards for "race-norming" in connection with ongoing adjudications of Settlement Class claims are likely to create incompatible standards of conduct for the NFL and for the professionals involved in administering the Settlement Agreement and providing testing related to that Agreement.

32. The proposed class also meets the requirements of Rule 23(b)(2), because (as explained above), the NFL has acted in substantially similar ways as to all class members, so that final injunctive and declaratory relief is appropriate respecting the class as a whole.

33. And finally, the proposed class meets the requirements of Rule 23(b)(3), because class members have no particular interest in individually controlling the prosecution of separate

actions. Similarly, to the best of Plaintiffs' counsel's knowledge, there is no existing litigation based on this controversy, other than litigation commenced or prompted by Plaintiffs' counsel. The litigation is well-situated for concentration in this Court, because the MDL Proceeding was filed here and continues to be administered and overseen by the Court here. And because the central issue in the case is whether the NFL has caused or enforced the application of a readily-identifiable set of racial manipulations to class members' scores, the discovery and proof of the class's claims is not likely to be difficult.

## COUNT ONE

(Deprivation of Equal Rights Under the Law, 42 U.S.C. § 1981)

34.     Plaintiffs repeat and reallege the contents of paragraphs 1-33 as if fully set forth herein.

35.     Plaintiffs and the NFL are parties to a contract, namely the Settlement Agreement.

36.     The NFL has caused that Agreement to be administered in such a way that Plaintiffs and all other Black Settlement Class members similarly situated are denied the same rights under the Settlement to compensation for injuries as White Settlement Class members. Thus, they are being denied "the same right in every State and Territory to make and enforce contracts, . . . as is enjoyed by white citizens."

37.     By causing the Agreement to be administered in such a way that Plaintiffs and other Black Settlement Class members do not have the same right to compensation for injuries as White Settlement Class members, the NFL has also denied Plaintiffs and other Black Settlement Class Members "the same right in every State and Territory . . . to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

38. As a result of the NFL's actions, Plaintiffs have endured pain, suffering, embarrassment and humiliation. These injuries are a direct result of the NFL's intentional racial discrimination directed towards Plaintiffs and all others similarly situated.

WHEREFORE, Plaintiffs demand relief as follows:

a. A declaration that the compelled or presumptive use of race-adjusted normative data to the detriment of Black Settlement Class members under the auspices of the Settlement Agreement is illegal under federal law;

b. An award of damages to Plaintiffs and all other class members to compensate them for their pain, suffering, embarrassment and humiliation, but not including their lost benefits under the Agreement;

c. An award of punitive damages;

d. An appropriate award of attorneys' fees and expenses under statutory or common law; and

e. Such other relief at law or in equity that the Court may deem just and proper.


## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury of all issues so triable as of right.


Dated:   August 25, 2020              /s/  *Cyril V. Smith*
                                      Cyril V. Smith*
                                      Zuckerman Spaeder LLP
                                      100 E. Pratt Street, Suite 2440
                                      Baltimore, MD  21202
                                      (410) 332-0444
                                      csmith@zuckerman.com


14

___/s/ *Steven N. Herman* ___
Aitan D. Goelman*
Steven N. Herman (Bar No. 205832)
David A. Reiser*
Ezra B. Marcus*
Megan S. McKoy*
Zuckerman Spaeder LLP
1800 M Street, 10th Floor
Washington, DC 20036
(202) 778-1800
agoelman@zuckerman.com
sherman@zuckerman.com
dreiser@zuckerman.com
emarcus@zuckerman.com
mmckoy@zuckerman.com

___/s/ *Edward S. Stone* ___
Edward S. Stone
Edward Stone Law P.C.
300 Park Avenue, 12th Floor
New York, NY 10022
(203) 504-8425
eddie@edwardstonelaw.com

___/s/ *J.R. Wyatt* ___
J.R. Wyatt
JR Wyatt Law PLLC
49 West 37th Street, 7th Floor
New York, New York 10018
(212) 557-2776
justin@jrwyattlaw.com

Attorneys for Plaintiffs

* *Pro hac vice* applications forthcoming.