**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KEVIN HENRY and NAJEH DAVENPORT, on behalf of themselves and others similarly situated,<br><br>     Plaintiffs<br><br>  v.<br><br>NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES LLC, successor-in-interest to NFL Properties, Inc.,<br><br>     Defendants. | No. 20-cv-04165-AB<br><br>Complaint – Class Action |
| THIS DOCUMENT RELATES TO:<br><br>MDL No. 2323 | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**NFL DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

    A.    The Settlement Agreement and the Use of Neuropsychological Testing
          in the Diagnostic Process ................................................................ 3

    B.    Plaintiffs and the Complaint ............................................................ 10

    C.    The Special Masters' Determination ................................................ 13

    D.    Plaintiffs' Motion for Relief .......................................................... 15

ARGUMENT ................................................................................................... 16

I.    Plaintiffs' Complaint Is an Improper Collateral Attack on the Judicially-
    Approved Settlement Agreement ........................................................ 18

II.    Plaintiffs Do Not State a Claim Under Section 1981 ............................ 22

    A.    Plaintiffs Do Not Plead the Necessary Discriminatory Intent ............ 23

    B.    Plaintiffs Do Not Sufficiently Plead But-For Causation .................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft* v. *Iqbal,*
556 U.S. 662 (2009)...................................................................................16

*Bakkali* v. *Walmart, Inc.,*
No. 20-cv-3440, 2020 WL 5517350 (E.D. Pa. Sept. 14, 2020)...................23, 25, 26

*Bechtel Corp.* v. *Local 215, Laborer's Int'l. Union of N. Am., AFL-CIO,*
544 F.2d 1207 (3d Cir.1976).......................................................................28

*Bell Atlantic Corp.* v. *Twombly,*
550 U.S. 544 (2007)...................................................................................16

*Brown* v. *Philip Morris Inc.,*
250 F.3d 789 (3d Cir. 2001).....................................................................22–23

*Buck* v. *Hampton Twp. Sch. Dist.,*
452 F.3d 256 (3d Cir. 2006).....................................................................3, 25

*Comcast Corp.* v. *Nat'l Ass'n of Afr. Am.-Owned Media,*
140 S. Ct. 1009 (2020)...........................................................................23, 26

*Dennis* v. *Trans Union, LLC,*
No. 14-cv-2865, 2016 WL 127453 (E.D. Pa. Jan. 12, 2016)...............................28

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab.
Litig.,*
431 F.3d 141 (3d Cir. 2005)...............................................................19, 20–21

*Doe* v. *Lower Merion Sch. Dist.,*
665 F.3d 524 (3d Cir. 2011).......................................................................24

*Gen. Bldg. Contractors Ass'n, Inc.* v. *Pennsylvania,*
458 U.S. 375 (1982)...............................................................................23, 25

*Gotthelf* v. *Toyota Motor Sales, U.S.A., Inc.,*
525 F. App'x 94 (3d Cir. 2013) ...................................................................21

*Santomenno ex rel. John Hancock Tr.* v. *John Hancock Life Ins. Co. (U.S.A),*
768 F.3d 284 (3d Cir. 2014)..............................................................10, 14, 25

*Juarez* v. *Nw. Mut. Life Ins. Co.,*
69 F. Supp. 3d 364 (S.D.N.Y. 2014)..........................................................23, 25

*In re: Nat'l Football League Players' Concussion Inj. Litig.*,
    307 F.R.D. 351 (E.D. Pa. 2015)........................................................................ *passim*

*In re: Nat'l Football League Players' Concussion Inj. Litig.*,
    821 F.3d 410 (3d Cir. 2016).......................................................3, 4, 19, 20

*In re Orthopedic Bone Screw Products Liab. Litig.*,
    350 F.3d 360 (3d Cir. 2003).......................................................17, 19

*Pollard* v. *Wawa Food Mkt.*,
    366 F. Supp. 2d 247 (E.D. Pa. 2005) ...........................................23–24

*Renfro* v. *Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011)...............................................................26

*S. Cross Overseas Agencies, Inc.* v. *Wah Kwong Shipping Grp. Ltd.*,
    181 F.3d 410 (3d Cir. 1999)...............................................................10

*Thompson* v. *U.S. Airways, Inc.*,
    No. 09-cv-870, 2011 WL 2935051 (E.D. Pa. July 20, 2011) ...........19–20

**Statutes**

42 U.S.C. § 1981 .................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. Proc. 8(a)(2)........................................................................26

Fed. R. Civ. Proc. 12(b)(6) ...............................................................16, 26

Robert K. Heaton et al., Revised Comprehensive Norms for an Expanded
    Halstead Reitan Battery: Demographically Adjusted
    Neuropsychological Norms for African American and Caucasian
    Adults (2004)......................................................................9, 13–14, 24

The National Football League and NFL Properties LLC (collectively, the "NFL Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Settlement Class Members[1] Kevin Henry's and Najeh Davenport's (together, the "Plaintiffs") Complaint for failure to state a claim.

## PRELIMINARY STATEMENT

Plaintiffs' putative class action Complaint—at bottom accusing the NFL Defendants of race discrimination based on independent neuropsychologists' widely-accepted practice of using demographic normative adjustments to accurately score diagnostic testing in the Concussion Settlement Program, as expressly permitted in the judicially-approved Settlement Agreement—has no basis in law or fact and should be summarily dismissed.

Plaintiffs are claimants in the NFL Concussion Settlement Program established by the Settlement Agreement. As this Court is well aware, the Settlement Agreement was the result of detailed, arms-length negotiations between the NFL Defendants and Class Counsel, was developed with assistance from top medical experts, and was finally approved by this Court and the Third Circuit more than four years ago, after a searching review of its terms and full evidentiary consideration of all objections mounted against it. The Settlement Agreement expressly provided that demographic—including race-based—normative adjustments *may* be used by independent neuropsychologists in connection with Settlement Program evaluations of *all* Retired Players. Although this Court heard more than 80 written objections to the design of the Settlement Program and the neuropsychological testing regime in particular, no objection was ever raised to the potential use of race-based adjustments in administering the neuropsychological testing.

---

[1] Capitalized terms not otherwise defined have the meaning assigned to them in the June 23, 2014 Settlement Agreement (as amended on Feb. 13, 2015) in *In re: National Football League Players' Concussion Inj. Litig.*, No. 12-md-2323-AB (E.D. Pa.), the ("MDL") and the ("Settlement Agreement").

Nevertheless, Plaintiffs bring this lawsuit belatedly challenging the Settlement Agreement's terms and erroneously asserting that independent clinicians' discretionary use (as most do in everyday practice) of race-based normative adjustments in the Settlement Program constitutes unlawful race discrimination.

Plaintiffs' Complaint cannot be sustained, for several reasons.

As an initial but dispositive matter, Plaintiffs' Complaint is an improper collateral attack on the terms of a judicially-approved Settlement Agreement and is thus barred under controlling law. The law in the Third Circuit is clear that settlement class members cannot bring a collateral attack challenging the terms or implementation of a judicially-approved class action settlement. Plaintiffs' impermissible collateral attack should thus be summarily dismissed for this reason alone.

In all events, Plaintiffs have not stated, and cannot plausibly state, a claim for race discrimination against the NFL Defendants based on independent clinicians' discretionary use of widely-accepted race-based normative adjustments to accurately score diagnostic testing in the Settlement Program. Far from being a purported tool for intentional race discrimination by the NFL as Plaintiffs must, but cannot, allege, race-based adjustments were specifically developed by the neuropsychological community (years before and wholly apart from anything having to do with this Settlement Program) to correct for bias in neuropsychological testing which, without adjustment, misdiagnosed Black test-takers—incorrectly characterizing healthy individuals as cognitively impaired—at up to three times the rate as White test-takers. The use of such demographic adjustments cannot remotely constitute intentional racial discrimination here, as such adjustments are well-established and widely used in the neuropsychological community, are applied at the sole discretion of independent clinicians in the Settlement Program to correct for

racial bias and not to perpetrate it, and were expressly provided for in the Settlement Agreement without objection by any of the over 20,000 Settlement Class Members or their counsel. Thus, Plaintiffs' 42 U.S.C. § 1981 ("Section 1981") claim fails, among other reasons, because Plaintiffs have not sufficiently pleaded that anyone involved in the Settlement's design or implementation—least of all the NFL Defendants—had the requisite purposeful discriminatory intent or that race was the "but for" cause of any injury.

For these reasons, as discussed in detail below, Plaintiffs' Complaint should be dismissed.

## STATEMENT OF FACTS[2]

### A. The Settlement Agreement and the Use of Neuropsychological Testing in the Diagnostic Process

On April 22, 2015, this Court issued a Final Order approving the Settlement Agreement between a Settlement Class of Retired NFL Football Players, of which Plaintiffs are Members, and the NFL Defendants (together, with the Settlement Class, the "Settling Parties"). *In re: Nat'l Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351 (E.D. Pa. 2015), *amended sub nom.* 12-md-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *aff'd sub nom.* 821 F.3d 410 (3d Cir. 2016), *as amended* (May 2, 2016) (the "Final Approval Memorandum"). The

---

[2] This summary is based on the allegations of Plaintiffs' Complaint—the factual averments of which the NFL Defendants assume to be true for purposes of this motion only—and, where applicable, the Class Action Settlement Agreement finally approved by this Court on April 22, 2015, the Court's "Final Approval Memorandum" (as defined herein), the Third Circuit's affirmance of this Court's approval, 821 F.3d 410 (3d Cir. 2016), and a recent Settlement Program remand decision concerning Plaintiff Davenport's claim issued by the Special Masters appointed by this Court to oversee the Settlement Program and its claim appeal process (the "Special Masters' Determination" as defined herein, *see infra* n.5). This publicly-available decision is attached as Exhibit A to the accompanying Declaration of Hannah J. Blonshteyn, dated November 2, 2020. The Court may consider these documents in adjudicating this motion under Rule 12(b) because they are integral to Plaintiffs' claims, are matters of official Court record subject to judicial notice, and/or are explicitly referenced in the Complaint (*see, e.g.*, ¶¶ 1, 5, 7, 14-18, 22). *See Buck* v. *Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, . . . and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)).

Settlement Agreement was the result of detailed, arms-length negotiations between Class Counsel appointed by this Court to represent the interests of all Settlement Class Members and the NFL Defendants and was developed with assistance from top medical experts. *See* Final Approval Memorandum, 307 F.R.D. at 363 ("A genuine dialogue between zealous and well-prepared adversaries transpired. [Mediator] Judge Phillips reports that the Parties engaged in 'arm's-length, hard-fought negotiations.'"); *id.* at 422 (rejecting objectors' arguments that Settling Parties' experts cannot be trusted and holding "[t]he Parties' experts have extensive qualifications," have "[c]ollectively. . . authored over 850 peer-reviewed scientific articles," and "provided months of assistance throughout the negotiation process to ensure that the Settlement was grounded in current science").

All Settlement Class Members received notice of the Settlement Agreement and had the opportunity to review and object to its terms. *See id.* at 383–86. The Settlement Agreement was subject to 83 written objections filed by 205 objectors, lengthy submissions by the Parties, and hearings conducted both by this Court and the Third Circuit. *See id.* at 369; *In re: Nat'l Football League Players' Concussion Inj. Litig.*, 821 F.3d 410, 423 (3d Cir. 2016). While many Class Members objected to the design of the Settlement Program and the neuropsychological testing regime in particular, no objection was ever raised to challenge the potential use of demographic adjustments—including race-based adjustments—in administering the neuropsychological testing, which was fully disclosed on the face of the Settlement Agreement.

This Court also thoroughly reviewed objections to notice and the adequacy of representation by Class Members, and both this Court and the Third Circuit found all due process requirements were met. *See id.* at 428, 435–36 (affirming District Court's findings that class representation and notice were adequate); Final Approval Memorandum, 307 F.R.D. at 386 ("The

requirements of Rule 23 and due process are satisfied.").  The Settling Parties—including Plaintiffs here, as Settlement Class Members—also explicitly agreed that upon the Settlement Agreement becoming effective, "[a]ny disputes or controversies arising out of, or related to, the interpretation, implementation, administration, and enforcement of this Settlement Agreement will be made by motion to the Court."  (Settlement Agmt. § 27.1.)

Pursuant to the Settlement Agreement, Class Counsel and the NFL Defendants agreed to a 65-year Settlement Program operated by both a neutral Court-appointed Claims Administrator and a neutral administrator for the Settlement's Baseline Assessment Program (the "BAP" and "BAP Administrator"), and guided at every turn by independent, leading neutral neurologists and neuropsychologists.  (Settlement Agmt. §§ 2.1(g)–(h), 5.7, 10.2; Final Approval Memorandum, 307 F.R.D. at 411–13.  The Settlement Program was designed to accomplish two primary goals:  (1) provide accurate baseline clinical assessments to Retired Players to understand their current condition; and (2) provide Monetary Awards to Retired Players diagnosed with Qualifying Diagnoses.  *See* Final Approval Memorandum, 307 F.R.D. at 365–66.  In the Program, *independent* medical clinicians examine the Retired Players and are authorized to render Qualifying Diagnoses consistent with the agreed-upon criteria, developed with expert assistance, underlying each Diagnosis.  (Settlement Agmt. §§ 6.3–6.6.)

Three diagnoses rely on neurocognitive testing:  (1) Level 1 Neurocognitive Impairment (moderate cognitive impairment); (2) Level 1.5 Neurocognitive Impairment (early dementia); and (3) Level 2 Neurocognitive Impairment (moderate dementia).  (*Id*. § 6.3(a), Ex. 1.) Level 1.5 and Level 2 are Qualifying Diagnoses for which a player may receive a Monetary Award. (*Id*. § 6.3(a).)  A diagnosis of Level 1 Neurocognitive Impairment is not eligible for a Monetary Award;  instead the Retired Player is entitled to receive reimbursement for treatment of the

condition (*e.g.*, pharmaceuticals, counseling, examination by Program providers) up to a certain monetary threshold. (*Id.* § 5.11.)

In negotiating the Settlement Agreement, the Settling Parties relied on leading experts to identify a battery of established and verified neuropsychological tests to facilitate the most accurate diagnoses. *See* Final Approval Memorandum, 307 F.R.D. at 411–13. Examinations for these diagnoses are available to Retired Players in two ways: Eligible Retired Players may receive free baseline cognitive examinations through the BAP to screen for and potentially diagnose Level 1, Level 1.5 or Level 2 Neurocognitive Impairment, or Retired Players may pay for an examination through a network of Qualified MAF Physicians eligible to render the full array of Qualifying Diagnoses, including Level 1.5 and Level 2 Neurocognitive Impairment. (Settlement Agmt. §§ 5, 6.5.)[3] Through both avenues, Retired Players are examined by independent neurologists and neuropsychologists selected by the neutral Claims Administrator and approved by the Settling Parties. (*Id.*) Any such Diagnosis is made solely by the independent clinicians and is subject to review and approval by the neutral Claims Administrator. (*Id.*) Neither the NFL Defendants nor Class Counsel participates in the clinical diagnoses.

BAP evaluations consist of two examinations: (1) a specified cognitive test battery administered by an approved BAP neuropsychologist, and (2) a basic neurological evaluation completed by a board-certified BAP neurologist. (*Id.* §§ 5.1–5.14.) Diagnoses of Level 1, 1.5, and 2 Neurocognitive Impairment made through the BAP must be made in accordance with the Settlement Agreement's stated criteria for those diagnoses. (*Id.* Ex. 1.) These criteria require, among other things, that the Retired Players' cognitive test scores meet certain specified thresholds

---

[3]    In addition, MAF Physicians can render Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease, and ALS. (Settlement Agmt. §§ 5, 6.5.)

in two of five cognitive domains, and that the Retired Players demonstrate a specific level of functional impairment caused by cognitive deficits.  (*Id*.)  Qualifying Diagnoses of Level 1.5 and 2 Neurocognitive Impairment rendered by a MAF Physician (as opposed to in the BAP) must be made in a manner "generally consistent" with these BAP criteria.  (*Id.*)

The Settlement Agreement's test battery includes 22 well-established individual tests to diagnose Levels 1, 1.5, and 2 Neurocognitive Impairment.  (*Id*. Ex. 2; Special Masters' Determination at 3); Final Approval Memorandum, 307 F.R.D. at 411–13.  These tests were not developed for the Settlement Program; to the contrary, their use long predates the Settlement Agreement.  *See* Final Approval Memorandum, 307 F.R.D. at 412.  As this Court concluded in its Final Approval Memorandum, these tests were carefully selected by the Settling Parties, based on the advice of leading experts in the field, as well-validated, widely-utilized tests that would be familiar to the neuropsychology community and result in accurate diagnoses.  *See id.* ("The Parties and their experts did not construct any test from scratch; each individual exam in the Test Battery is a well-established and validated tool for diagnosing neurocognitive impairment in any age group and is supported by extensive empirical testing to ensure its validity.").

### 1. *Potential Use of Demographic Considerations and Adjustments*

The negotiated and judicially-approved Settlement Agreement expressly contemplates examining neuropsychologists' use of demographic—including race-based—considerations and adjustments in two ways:  (1) in the estimation of the Retired Player's level of intellectual functioning prior to any suspected cognitive decline ("premorbid intellectual functioning"), and (2) in scoring the results of a Retired Player's cognitive testing.  (Settlement Agmt. Ex. 2 §§ 3, 4.)

To determine whether a Retired Player has experienced a decline from a previous level of intellectual functioning, and to assess the extent of any such decline, the neuropsychologist

must first estimate the Retired Player's premorbid intellectual functioning. (*Id*. Ex. 2 § 3.) The Settlement Agreement provides that premorbid intellectual functioning will be estimated using one of three methods, selected in the examining practitioner's discretion: (1) a reading test (the "Test of Premorbid Functioning" or "TOPF"), (2) estimation based purely on the individual's demographics, and (3) a combined method that relies both on the reading test and the individual's demographics. (*Id*.) The Settlement Agreement makes clear that, where demographics are considered, this would include "**race/ethnicity**." (*Id*. ("For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, **race/ethnicity**, and education are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.") (emphases added).) The Parties adopted this framework because it is the long-standing standard approach in clinical practice. Final Approval Memorandum, 307 F.R.D. at 404 ("[I]t is a standard feature of any neuropsychological assessment to only judge raw scores in the context of demographic factors and estimates of premorbid ability" (quoting Decl. of Dr. John Keilp ¶ 45, *In re: National Football League Players' Concussion Inj. Litig.*, No. 12-md-2323-AB, ECF No. 6423-20 (E.D. Pa. Nov. 12, 2014))).

As noted, during the Court's consideration of the Settlement Agreement, no Class Member objected to the potential use of demographic factors, including race/ethnicity, in determining premorbid intellectual functioning. Instead, one objection challenged the method that did *not* incorporate demographic factors: "Some Objectors argue[d] that the TOPF disadvantages those with accents because one component [the reading test] asks participants to read a list of words and pronounce them exactly." *Id.* at 412 n.81. This Court dismissed that objection, noting

that the TOPF "also includes demographic formulas" as an alternative means of assessing premorbid intellectual functioning that can take such individual characteristics into account, and expressly determined that "using the [TOPF] together with a complex demographics statistical model . . . is a fair and reasonable manner to account for individual variability." *Id*. at 404 (quoting Decl. of Class Counsel Expert Dr. Richard Hamilton ¶ 15, *In re: National Football League Players' Concussion Inj. Litig.*, No. 12-md-2323-AB, ECF No. 6423-25 (E.D. Pa. Nov. 12, 2014)).

The second way the Settlement Agreement permits use of demographic—including race-based—normative adjustments is in the testing of a Retired Player's current cognitive ability. (Settlement Agmt. Ex. 2 § 4.) The Settlement Agreement's 22 tests of current cognitive ability result in a set of raw scores, which are then converted into "demographically-adjusted test scores" (*e.g.*, "T scores") for assessment. (*Id*.) To obtain a Retired Player's T score, the neuropsychologist compares the Player's unique raw score to the raw scores obtained from a sample of unimpaired individuals with comparable characteristics. (*See* Special Masters' Determination at 3.)[4] The Settlement Agreement makes clear that the 22 tests were specifically selected "***based on the availability of demographically-adjusted normative data for Caucasians and African Americans***." (Settlement Agmt. Ex. 2 § 4 (emphasis added).) While the Settlement Agreement clearly contemplated (and disclosed) the potential use of race-based demographic norms in evaluating tests of current cognitive ability, no objections were made to this feature of the Settlement Program.

---

[4] The T score reflects how far (if at all) the Retired Player deviates from the mean unimpaired score of his comparable group, which "permits the clinician to evaluate the test taker's performance in different cognitive domains using common metrics." (Special Masters' Determination at 3; *id*. at 4 ("The ability to convert raw test scores to demographically corrected scores . . . facilitates comparisons of an individual's test results with normal expectations based on that person's demographic characteristics." (quoting ROBERT K. HEATON ET AL., REVISED COMPREHENSIVE NORMS FOR AN EXPANDED HALSTEAD REITAN BATTERY: DEMOGRAPHICALLY ADJUSTED NEUROPSYCHOLOGICAL NORMS FOR AFRICAN AMERICAN AND CAUCASIAN ADULTS 4 (2004))).)

The Settlement Agreement also states that a more detailed "user manual" would be developed and "provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria." (*Id.*) Consistent with this mandate, the Settling Parties worked collaboratively on the Clinician's Interpretation Guide (the "Guide"), advised by their respective expert neuropsychologists. (*See* Special Masters' Determination at 8.) The Guide "recommend[s]," but does not require, the use of "full demographic correction"—which includes race—in converting a test-taker's raw scores to scale scores. (*Id.* at 9.) As explained more fully below, the Special Masters overseeing the Settlement Program have issued a written opinion explicitly confirming that race-based normative adjustments are not required by the Settlement Agreement, and that no claim will be denied *solely* because a clinician did not use them.[5] (*Id.* at 10.)

## B. Plaintiffs and the Complaint

Plaintiffs Kevin Henry and Najeh Davenport purport to bring a new class action complaint on behalf of Black members of the Settlement Class "who received testing under the Settlement Agreement as part of the Baseline Assessment Program, or in connection with his

---

[5] Under Federal Rule of Civil Procedure 53(a)(1), this Court appointed Special Masters, including Wendell Pritchett, Jo-Ann Verrier, and David Hoffman, to "implement and administer the Class Action Settlement Agreement," (Orders, *In re: National Football League Players' Concussion Inj. Litig.*, No. 12-md-2323-AB, ECF Nos. 6871 (E.D. Pa. July 13, 2016), 11022 (E.D. Pa. Mar. 5, 2020)), consistent with the rules and responsibilities as set forth in the Settlement Agreement. (Settlement Agmt. § 10.1.) As part of their duties, Special Masters Pritchett and Hoffman issued the Special Masters' Determination on August 20, 2020, and published it on the Settlement Program's official website. *See* Special Masters' Decision, NFL Concussion Settlement Website (Aug. 20, 2020), https://www.nflconcussionsettlement.com/Docs/demographic_norms_sm.pdf. As a publicly available, published decision that is specifically referenced in Plaintiffs' Complaint, the Special Masters' Determination can be relied upon in this motion to dismiss. *See Santomenno ex rel. John Hancock Tr.* v. *John Hancock Life Ins. Co. (U.S.A)*, 768 F.3d 284, 290–91 (3d Cir. 2014) ("[D]ocuments that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim" (internal quotations omitted)); *S. Cross Overseas Agencies, Inc.* v. *Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426–27 (3d Cir. 1999) (finding that the court can take judicial notice of another court's opinion in a related case and that since it is a document upon which the plaintiffs rely and is "specifically reference[d]" in the complaint, the court "may therefore examine the decision to see if it contradicts the complaint's legal conclusions or factual claims").

evaluation by any Qualified Monetary Award Fund physician, and whose test results were subjected to any form of adverse adjustment based on that individual's status as Black or African-American." (Compl. ¶ 27.)  The Complaint is brought as a related case to the MDL Proceeding. (*Id*. ¶ 1 n.1.)

The Complaint asserts that the potential use of racial demographic normative adjustments in the Settlement Program is "an unacceptable flaw" because claims allegedly are paid "under the Settlement Agreement based on a formula for identifying qualifying diagnoses that explicitly and deliberately discriminates on the basis of race." (*Id*. ¶ 1.)  Notwithstanding that the use of race-based adjustments is not mandatory under the Settlement, Plaintiffs allege that "[w]hen being evaluated for the Qualifying Diagnoses of Neurocognitive Impairment, Black former players are automatically assumed (through a statistical manipulation called 'race-norming') to have started with worse cognitive functioning than White former players," and therefore are "presumed to have suffered less impairment" if receiving the same raw score on neuropsychological testing, and thus are "less likely to qualify for compensation." (*Id*.)  Plaintiffs assert "intentional discrimination on the basis of race" (*id*. ¶ 2), "executed through the League-sponsored Settlement Agreement" (*id*. ¶ 3), and bring a single cause of action against the NFL Defendants for "Deprivation of Equal Rights Under the Law" pursuant to Section 1981 (*id*. ¶¶ 34–38), accusing the NFL Defendants, but not similarly situated Class Counsel or the Settlement Program that actually operates the Settlement claims process, of causing the Settlement Agreement "to be administered in such a way that Plaintiffs and all other Black Settlement Class members similarly situated are denied the same rights under the Settlement to compensation for injuries as White Settlement Class members" (*id*. ¶ 36).  Plaintiffs seek a declaration that "the compelled or presumptive use of race-adjusted normative data to the detriment of Black Settlement Class

members under the auspices of the Settlement Agreement is illegal under federal law," and also seek monetary damages, including punitive damages, and fees and expenses. (*Id*. ¶ 38.)

### 1. *Kevin Henry*

Plaintiff Kevin Henry filed a Settlement Program claim based on a diagnosis of Level 1.5 Neurocognitive Impairment made by a Qualified MAF Physician in 2017, which the Claims Administrator denied. (*Id*. ¶ 6.) Mr. Henry does not allege—nor could he—that he exercised his rights under the Settlement Program to appeal that claim denial.

Mr. Henry also alleges that he underwent a second neurological evaluation in 2019 (without specifying whether the examination was conducted by a Qualified MAF Physician or by Qualified BAP Providers), but the evaluating clinician adjusted his raw scores using full demographic norms and determined that Mr. Henry did not meet the impairment criteria for a Level 1.5 Neurocognitive Impairment diagnosis. (*Id*.) Mr. Henry states that he "intends to make an additional, future application for benefits under the Settlement Agreement." (*Id*.)

### 2. *Najeh Davenport*

Plaintiff Najeh Davenport filed a claim based on a diagnosis of Level 1.5 Neurocognitive Impairment made by a Qualified MAF Physician on November 5, 2019. (*Id*. ¶ 7; Special Masters' Determination at 1.) The Claims Administrator approved the claim without consulting the neutral neurological and neuropsychological experts serving as the Court-appointed Appeals Advisory Panel members and Consultants ("AAPs" and "AAPCs, respectively"), who are available for consultation by the Claims Administrator in connection with medical questions arising in the claim determination process. (Special Masters' Determination at 1.) The NFL Defendants appealed the Claims Administrator's decision, arguing that the neuropsychological assessment was invalid—including, among other reasons, because it was unclear what demographic adjustments were used and the use of full demographic adjustments would result in

no impairment—and that factors other than neurocognitive deficits may have been responsible for Mr. Davenport's functional impairment. (*Id.* at 1–2; Compl. ¶ 7.) After full briefing and consulting with AAP and AAPC experts, and as explained more fully below, Special Masters Pritchett and Hoffman issued a written decision remanding Mr. Davenport's claim to allow the Claims Administrator to "seek more clarity from [the neuropsychologist] as to exactly what he did [with respect to demographic adjustments], and how it relates to his normal practice." (Special Masters' Determination at 12.) The claim remains pending before the Claims Administrator at this time, and Mr. Davenport has filed a legal objection to the remand decision in accordance with the Settlement Program's rules.

### C. The Special Masters' Determination

In the Davenport remand decision, and based on consultation with the neutral medical experts appointed by the Court to serve as AAPs and AAPCs, the Special Masters explained the origin and diagnostic rationale for the use of race-based normative adjustments in neuropsychological testing.

As the Special Masters explained, "demographic adjustments in neuropsychological testing strive to make the raw score meaningful when controlling for factors that are not unique to the individual's cognition." (*Id.* at 3.) While recognizing that race and ethnicity are more complicated than certain other demographic factors (such as age and education), the Special Masters acknowledged that these adjustments were developed by experts in the neuropsychological community "to be a key tool for avoiding misclassification of cognitive impairment" (*id.* at 4), given that studies showed that failure to apply race-based adjustments results in "a substantial (sometimes up to three-fold) increase in the probability of misclassifying normal African Americans as having brain disorders, as compared to misclassification rates for Caucasians." (*Id.* at 4–5 (quoting ROBERT K. HEATON ET AL., REVISED COMPREHENSIVE NORMS

FOR AN EXPANDED HALSTEAD REITAN BATTERY: DEMOGRAPHICALLY ADJUSTED NEUROPSYCHOLOGICAL NORMS FOR AFRICAN AMERICAN AND CAUCASIAN ADULTS 4 (2004)).)[6] The Special Masters' Determination explained that because the leading cognitive tests were "developed for and normed on largely White populations," the use of race norms may "correct for biased measuring techniques," and that race is also seen as offering an "imperfect proxy" for non-cognitive factors such as "acculturation, socioeconomic status, and quality of education," all of which can affect performance. (*Id.* at 4.)

With regard to the Settlement Program, the Special Masters pointed to the Settlement Agreement's explicit statement that neuropsychological tests were selected based on the availability of demographically-adjusted normative data for White and Black test-takers, concluding that "[t]his language suggests that the Agreement's drafters believed that demographically adjusting normative data was an important technique in accurately identifying whether the Claimant demonstrated" cognitive impairment. (*Id.* at 9.) Nonetheless, the Special Masters correctly held "the Agreement does not explicitly require adjustments based on *race*, but rather a broader category of 'demographic' adjustment as defined by a user manual." (*Id.*) Citing the Clinician's Interpretation Guide, the Special Masters found that "[t]he Settlement's drafters were obviously concerned not to predetermine which particular kinds of demographic adjustment

---

[6] The Complaint explicitly cites this scientific source (*see* Compl. ¶ 21), and thus the Court may directly rely on it in deciding this motion to dismiss. *See Santomenno*, 768 F.3d at 290–91 ("[D]ocuments that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim." (internal quotations omitted)). According to Heaton, research showed that, when unadjusted for race, testing typically results in a substantial (up to three-fold) increase in the likelihood of misdiagnosing healthy Black individuals as cognitively impaired, compared to White individuals; whereas the use of racial norms corrected this significant disparity, substantially equalizing the probability of accurate diagnosis between White and Black test-takers. HEATON, *supra*, at 4. This document is not attached as an exhibit because we understand the neuropsychological community considers it highly confidential and is concerned that the integrity of certain confidential data in the document could be compromised if broadly shared. The NFL Defendants note that neuropsychologists, including AAPC neuropsychologists available to the Court, have access to this document.

(i.e., for race, or socioeconomic status) were the gold standard, or were universally appropriate," and therefore "admirabl[y]" provided "discretionary language" in the Guide, which "expresses a set of default best practices, but expressly does not mandate them." (*Id*. at 10.) For this reason, the Special Masters held that "it is inappropriate to deny a claim solely because the clinician chose to reject the Guide's recommendation to use African American normative samples in interpreting raw scores." (*Id*.)[7]

Nonetheless, the Special Masters remanded Mr. Davenport's claim because "significant questions remain as to what system of adjustments [the neuropsychologist] used in assessing Mr. Davenport, and how reflective that approach is of his general practice." (*Id*. at 12.) The Special Masters cited the neuropsychologist's failure to fully cooperate with the Claims Administrator, and the fact that "[h]is report is lamentably devoid of the sort of detail which could enable the Claims Administrator to defer to it." (*Id*.) As a general matter, the Special Masters cautioned that while clinicians maintain discretion as to the use of racial norms, "[t]he Claims Administrator may fairly worry that the clinician decided to adjust, or not, as a way of achieving a financial result for a particular player, instead of as an exercise of medical judgment," and therefore "may require clinicians to show that their decision to avoid the recommendation was consistent with their ordinary practice." (*Id*.)

### D. Plaintiffs' Motion for Relief

Simultaneous with filing this Complaint, Plaintiffs filed a Motion for Relief under Article XXVII of the Settlement Agreement or for Relief from Judgment, 12-md-2323, ECF No. 11169 (Aug. 25, 2020) (the "Motion for Relief" or "Motion"), with this Court. That Motion asserts

---

[7]    Indeed, the Special Masters' ruling belies the purported factual premise of Plaintiffs' Complaint—that the use of race normative adjustments is automatic or otherwise presumed in the Settlement Program.

substantially the same allegations as the Complaint (including a violation of Section 1981), and at bottom accuses the Concussion Settlement Program (as opposed to just the NFL Defendants) of race discrimination arising out of independent neuropsychologists' widely-accepted practice of making discretionary use of demographic normative adjustments to accurately score diagnostic testing. The NFL Defendants filed their opposition to the Motion for Relief on October 8, 2020. (NFL Parties' Opp. to Kevin Henry and Najeh Davenport's Mot. for Relief, *In re: National Football League Players' Concussion Inj. Litig.*, No. 12-md-2323-AB, ECF No. 11204 (E.D. Pa. Oct. 8, 2020) (the "Opposition to Motion for Relief").) Class Counsel also opposed the Motion, arguing that Plaintiffs' claims are "without merit" and that the Program was modeled to track regular clinical practice by making demographic norms, including for race, available to neuropsychologists for use based on their "best clinical judgment." (*See* Class Counsel's Mem. in Resp. to Mot. For Relief at 2–3, *In re: National Football League Players' Concussion Inj. Litig.*, No. 12-md-2323-AB, ECF No. 11205 (E.D. Pa. Oct. 8, 2020).)

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). In applying this standard of facial plausibility, the Court accepts all factual allegations as true, but it does not credit "mere conclusory statements." *Id*.

Here, Plaintiffs' sole claim is both procedurally barred and wholly lacking in factual allegations sufficient to allow it to proceed. Plaintiffs cannot attack a Settlement Agreement

term—the permissible and discretionary use of racial normative adjustments—as discriminatory because the Settlement Agreement was approved in the Final Approval Memorandum of this Court more than four years ago, and only after Plaintiffs (and all other Settlement Class Members) were afforded notice of and the opportunity to object to Settlement Agreement terms.[8]  Plaintiffs' Complaint is plainly an improper collateral attack on the terms of the judicially-approved Settlement Agreement, and it is therefore barred under controlling Third Circuit law.  *See, e.g.*, *In re Orthopedic Bone Screw Products Liab. Litig.*, 350 F.3d 360, 364–65 (3d Cir. 2003) (holding a "challenge to the propriety of the settlement agreement and its terms" is no longer timely once "the settlement agreement has been approved in a final, unappealable order").  Moreover, Plaintiffs, along with all other Settlement Class Members, agreed that "[a]ny disputes or controversies arising out of, or related to, the interpretation, implementation, administration, and enforcement" of the Settlement Agreement would be made by motion to this Court in connection with its continuing jurisdiction over the Agreement—and not brought in a separate proceeding such as this. (Settlement Agmt. § 27.1.)  This collateral attack on the Settlement is clearly barred under binding Third Circuit law.

Moreover, even if the Complaint were not an impermissible collateral attack on the finally-approved Settlement Agreement (and it is), Plaintiffs' Section 1981 claim fails as a matter of law because Plaintiffs have not alleged facts sufficient to show the requisite purposeful intent to discriminate or that the discretionary use of racial normative adjustments was the "but for" cause of any injury to Plaintiffs.  To the contrary, the very documents incorporated in the Complaint demonstrate that race-based demographic adjustments were expressly made available—but not

---

[8]  *See* Final Approval Memorandum, 307 F.R.D. at 385 ("[T]he Settlement Class Notice clearly described [] the terms of the Settlement and the rights of Class Members to opt out or object.  Class Counsel's notice program ensured that these materials reached those with an interest in the litigation. The requirements of Rule 23 and due process are satisfied.").

mandatory—in the Settlement Program (without objection) to promote diagnostic accuracy and *avoid* racial bias in neuropsychological testing, which had been shown to over-diagnose normal Black test-takers at up to three-times the rate of White test-takers.

For the reasons set forth below, the Complaint should be dismissed.

## I.     Plaintiffs' Complaint Is an Improper Collateral Attack on the Judicially-Approved Settlement Agreement

Under binding Third Circuit precedent, collateral attacks, such as this, on the terms of a judicially-approved Settlement Agreement are absolutely foreclosed.

In their Complaint, Plaintiffs accuse the NFL Defendants of a scheme—"executed through the League-sponsored Settlement Agreement" (Compl. ¶ 3)—to permit clinicians to use racial demographic adjustments when converting raw test scores to T scores in neuropsychological testing. (*See, e.g.*, *id*. ¶¶ 1, 19.) While the Complaint often purports to summarize what the NFL Defendants have *argued* with regard to individual claim appeals (*see, e.g.*, *id*. ¶¶ 20–21, 23–24), and styles its claim as against the *NFL Defendants*, the Complaint—at its core—is an attack on the judicially-approved *Settlement Agreement itself.* It seeks to certify a class of Black Retired Players whose evaluating, neutral clinicians in the Settlement Program used racial normative adjustments where such use resulted in "any form of adverse adjustment based on that individual's status as Black or African-American," and requests a "declaration that the compelled or presumptive use of race-adjusted normative data . . . is illegal under federal law." (*Id*. ¶¶ 27, 38.) But the negotiated and judicially-approved Settlement Agreement expressly contemplates the potential use of demographic, including racial, normative adjustments—both in the estimation of the Retired Player's premorbid intellectual functioning and in scoring the results of a Retired Player's cognitive testing. (Settlement Agmt. Ex. 2 §§ 3, 4.) Counsel representing the interests of these Plaintiffs and the proposed class negotiated and agreed to those terms based on the sound advice

of their retained experts, which this Court then approved in the Final Approval Memorandum, affirmed by the Third Circuit, which binds these Plaintiffs and bars precisely this kind of claim. Final Approval Memorandum, 307 F.R.D. at 369; *In re: Nat'l Football League Players' Concussion Inj. Litig.*, 821 F.3d at 423.

Specifically, the Settlement Agreement explicitly provides that clinicians may choose among three methods to estimate premorbid intellectual functioning, two of which are based on demographics, including "race/ethnicity." (Settlement Agmt. Ex. 2 § 3.) In addition, the Settlement Agreement explicitly disclosed that the 22 neuropsychological tests used in the BAP, whose scores must be converted to "demographically-adjusted" scores, were specifically selected "based on the availability of demographically-adjusted normative data for Caucasians and African Americans." (*Id.* Ex. 2 § 4.) This provision made abundantly clear that clinicians would be able to use the very "race-adjusted normative data" to which Plaintiffs now object.

Plaintiffs had ample opportunity to object to these Settlement Agreement terms at the time of the fairness hearing or on appeal; but they failed to do so. They also could have chosen to opt out of the Settlement. Having chosen to remain in the class, under binding Third Circuit law, Plaintiffs are now barred from challenging the propriety of the Settlement Agreement and these terms. *In re Orthopedic Bone Screw*, 350 F.3d at 364–65 (holding that a "challenge to the propriety of the settlement agreement and its terms" is foreclosed by the approval of the settlement agreement "in a final, unappealable order"). In the Third Circuit, collateral attacks on a class action settlement are permissible only for due process violations, such as inadequate representation or ineffective notice. *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 431 F.3d 141, 149 (3d Cir. 2005) (holding appellants' challenge "is clearly inappropriate as it is not a component of a due process challenge, appropriate for collateral attack"); *see also*

*Thompson* v. *U.S. Airways, Inc.*, No. 09-cv-870, 2011 WL 2935051, at *3 (E.D. Pa. July 20, 2011) ("The right to collaterally attack an already-certified class is accorded only those class members who have not been granted all of the requisite due process protections.").[9] Here, Plaintiffs do not argue (nor could they) that they were not afforded adequate due process protections. "In a class where opt out rights are afforded, these protections are adequate representation by the class representatives, notice of the class proceedings, and the opportunity to be heard and participate in the class proceedings." *In re Diet Drugs*, 431 F.3d at 145. This Court and the Third Circuit both found that the settlement satisfied all Rule 23 requirements and due process protections. Final Approval Memorandum, 307 F.R.D. at 379 ("The adequacy of representation requirement is satisfied."); *id.* ("[T]he Settlement Class Notice clearly described [] the terms of the Settlement and the rights of Class Members to opt out or object. Class Counsel's notice program ensured that these materials reached those with an interest in the litigation. The requirements of Rule 23 and due process are satisfied."); *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d at 435–36 ("The District Court found that the content of the class notice and its distribution to the class satisfied Rule 23 and due process . . . . We agree."); *id.* at 428 ("Several objectors challenge the District Court's adequacy-of-representation finding, but we conclude that it was not an abuse of discretion."). "Once a court has decided that the due process protections did occur for a

---

[9]   The NFL Defendants are entitled to finality on claims settled over five years ago, both as a matter of law and sound public policy. Permitting Plaintiffs to bring this action would invite countless collateral attacks on a Settlement that has already been subject to careful review and scrutiny both by this Court and the Third Circuit. *See, e.g.*, *In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, 05-md-1712, 2013 WL 3463503, at *8 (E.D. Pa. July 10, 2013) (enjoining claims that were "in effect post-negotiation 'collateral attacks' on the settlement," in part because, "given the thousands of potential class members who could have [also] submitted [the same] claim, the potential for disruption to the settlement [in permitting the claims] [wa]s great. Indeed, if the Court were to allow such claims to go forth, the defendants would no doubt be reluctant to enter into settlement agreements in the first instance. In the words of the Third Circuit, '[a]llowing comprehensive settlements to be undermined in this way would undeniably deter similar settlements in the future.' To permit such claims not only overwhelms the instant settlement, but would likely have a chilling effect on future settlement negotiations, as well." (internal citations omitted)).

particular class member or group of class members, the issue may not be relitigated." *In re Diet Drugs*, 431 F.3d at 146; *see also Gotthelf* v. *Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 101–03 (3d Cir. 2013) (affirming 12(b)(6) dismissal because the due process grounds for plaintiff's collateral attack had already been presented to and resolved by the district court).

To the extent Plaintiffs attempt to argue that their Complaint does not challenge the Settlement Agreement's provisions permitting clinicians' use of race-based demographic adjustments but, instead, challenges the Clinicians' Interpretation Guide (recommending, but not mandating, the use of full demographic adjustments) or the implementation of that recommendation, this too would constitute an improper collateral attack on the Settlement Agreement. The Settlement Agreement *expressly* provided that the neuropsychological tests had been specifically selected "based on the availability of demographically-adjusted normative data for Caucasians and African Americans"; the Settlement Agreement also *expressly* provided that a user manual would be "provided to neuropsychologists setting out the . . . statistical and normative data to support the impairment criteria." (Settlement Agmt. Ex. 2 § 4.) It is thus hardly surprising, much less a departure from or an amendment to the Settlement Agreement, that full demographic, including race-based, norms would be "recommended" by the Clinician's Interpretation Guide in converting raw scores to scaled scores. (Special Masters' Determination at 9.) In all events, as the Special Masters' Determination makes clear, the Guide "leaves significant room for clinical discretion" in the choice of norms, as it "only *recommends*"—but does not mandate—the use of race-based norms. (*Id.* at 10.) For this reason, the Special Masters held that "it is inappropriate to deny a claim solely because the clinician chose to reject the Guide's recommendation to use African American normative samples in interpreting raw scores." (*Id.*)

The Settlement Agreement thus always mandated the creation of a clinician's user manual, and the resultant Clinician's Interpretation Guide merely reflects the Settlement's clear terms with respect to the use of race-based normative adjustments.  As a result, any attack on the Guide or its implementation constitutes a "dispute[] or controvers[y] arising out of, or related to, the interpretation, implementation, administration, and enforcement of this Settlement Agreement," which, under the Settlement Agreement's clear terms "will be made by motion to the Court" and not through a collateral attack such as this.  (Settlement Agmt. § 27.1.)  Because absent class members received all necessary due process protections, Plaintiffs are bound by this provision in the Settlement Agreement and must bring their challenge by motion to this Court.  In fact, tacitly conceding as much, Plaintiffs have in fact brought just such a motion based on identical allegations.

For these reasons, binding Third Circuit law compels dismissal of the Complaint.

## II.      Plaintiffs Do Not State a Claim Under Section 1981

Even if the Complaint were not an improper collateral attack on the Settlement Agreement, Plaintiffs have not stated a plausible Section 1981 claim for which relief can be granted.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981 (2019).  To state a Section 1981 claim, Plaintiffs must allege facts supporting "the following elements:  (1) [they are] a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts."  *Brown* v. *Philip Morris Inc.*, 250 F.3d 789, 797

(3d Cir. 2001) (affirming dismissal of claim) (internal quotations omitted). In addition, Plaintiffs must "initially plead and ultimately prove that, ***but for*** race," they would not have suffered their injury, if any. *Comcast Corp.* v. *Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014–15, 1019 (2020) (emphasis added) (reviewing dismissal of claim); *see also Bakkali* v. *Walmart, Inc.*, No. 20-cv-3440, 2020 WL 5517350, at *3 (E.D. Pa. Sept. 14, 2020) (same) (describing standard on a motion to dismiss).

Plaintiffs' Complaint has not come close to meeting this burden, because, among other reasons, the Complaint does not sufficiently plead either the requisite discriminatory intent by the NFL Defendants, or that race was the but for cause of Plaintiffs' putative injuries.

## A. Plaintiffs Do Not Plead the Necessary Discriminatory Intent

Plaintiffs do not—and cannot—remotely allege that anyone involved in the Settlement's design or implementation had the requisite discriminatory intent where, as here, the judicial record is clear and indisputable that first, the provisions at issue are standard in clinical practice and designed to achieve diagnostic accuracy and, indeed, correct for racial bias, not perpetuate it, and second—as the Special Masters' Determination makes clear—the decision whether to use the race-based demographic adjustments is the clinicians and not that of the NFL Parties, the putative defendants here.

The law is clear: Section 1981 can "be violated only by ***purposeful discrimination***," *Gen. Bldg. Contractors Ass'n, Inc.* v. *Pennsylvania*, 458 U.S. 375, 391 (1982) (emphasis added), which requires more than "intent as volition or intent as awareness of consequences," *Juarez* v. *Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 368 (S.D.N.Y. 2014) (quoting *Ashcroft*, 556 U.S. at 676) (describing the motion to dismiss standard). Discrimination is intentional only if the defendant "selected or reaffirmed a particular course of action 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pollard* v. *Wawa Food*

*Mkt.*, 366 F. Supp. 2d 247, 252–53 (E.D. Pa. 2005) (disparate impact claims "are not actionable under section 1981" as "discriminatory **motive**" is required (emphasis added)); *Doe* v. *Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011) ("Racially discriminatory purpose means that the decisionmaker adopted the challenged action . . . **because** the action would benefit or burden an identifiable group." (emphasis added)).

Here, the Special Masters have already found that the Settling Parties had a *non-discriminatory* purpose in ensuring that racial demographic adjustments would be available for use in scoring neuropsychological testing. (*See, e.g.*, Special Masters' Determination at 9–10 (noting the Settlement Agreement's explicit statement that tests were selected based on the availability of demographically-adjusted normative data for White and Black test-takers, and concluding that "[t]his language suggests that the Agreement's drafters believed that demographically adjusting normative data was an important technique in accurately identifying whether the Claimant demonstrated" cognitive impairment).) As the Special Masters' Determination explains, these adjustments were developed by scientific experts in the neuropsychological community "to be a key tool for avoiding misclassification of cognitive impairment," where research demonstrated that failure to apply such adjustments resulted in up to a three-fold increase in the probability of misclassifying normal Black test-takers as having brain disorders compared to White test-takers. (Special Masters' Determination at 4–5; HEATON, *supra*, at 4.)[10] As such, the judicial record and documents referred to in Plaintiffs' own Complaint belie any conclusory claim that race-based demographic adjustments were adopted with a racially discriminatory purpose, where such well-recognized and commonly-used adjustments were specifically created by the neuropsychological

---

[10] Beyond these documents cited in the Complaint, there is a significant body of neuropsychological research and literature supporting the use of race-based demographic adjustments to further diagnostic accuracy. (*See, e.g.*, discussion in Opposition to Motion for Relief at 13–19.)

community—and had been demonstrated in studies—to improve diagnostic accuracy and, as a result, *equalize* the rate of misdiagnosis between Black and White test-takers and ensure they are evaluated on a fair and comparable basis.[11]

Moreover, Plaintiffs' conclusory allegation that "[o]n information and belief, the NFL *expected* and intended this [putatively racially discriminatory] result in drafting, interpreting, and enforcing the Settlement Agreement," (Compl. ¶ 5 (emphasis added)), is both false and insufficient on its face. It is false because it is undisputed that the NFL Defendants did not draft the Settlement Agreement and Clinician's Interpretation Guide on their own, nor are they empowered to interpret or enforce the Agreement. Class Counsel vigorously represented the Class—including these Plaintiffs and the putative class they seek to represent—interests in drafting the Agreement and the Guide; and it is the Court and the Special Masters—not the NFL Defendants—who interpret and enforce the Agreement. The allegation is legally insufficient as well, as "intent as awareness of consequences"—all that Plaintiffs allege here—cannot sustain a Section 1981 claim. *See Juarez*, 69 F. Supp. 3d at 368. Rather, Plaintiffs must, but do not, allege "purposeful discrimination."[12] *See Gen. Bldg. Contractors Ass'n, Inc.*, 458 U.S. at 391.

Moreover, as the Special Masters' Determination, the Settlement Agreement and the Clinician's Interpretation Guide make clear, the NFL Defendants do *not* make the decision as

---

[11] *See Buck*, 452 F.3d at 260 ("In evaluating a motion to dismiss, we may consider . . . any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" (quoting Wright & Miller § 1357)); *Santomenno,* 768 F.3d at 290–91 (considering 401(k) plan contracts and supporting documents in its decision to affirm the district court's granting of motion to dismiss because a "court may consider . . . documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, [and s]imilarly, documents that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim" (internal quotations omitted)).

[12] While Plaintiffs are not required to prove discriminatory intent at the motion to dismiss stage, they are required to "'put forth allegations that raise a reasonable expectation that discovery will reveal evidence of it.'" *Bakkali*, 2020 WL 5517350 at *4 n.1 (internal quotations omitted). As discussed, they have utterly failed to do so here, particularly where the Special Masters themselves concluded that demographic normative adjustments were created and adopted in furtherance of diagnostic accuracy.

to whether racial normative adjustments are used in connection with any Claimant's claim. Rather that determination—consistent with longstanding neuropsychological practice and every other diagnostic aspect of the Settlement Program—is left to the discretion of the independent clinician tasked with performing and scoring the diagnostic testing. Simply put, Plaintiffs' conclusory intent allegations cannot be sustained where, as here, the NFL Defendants play no role whatsoever in that determination.

Accordingly, Plaintiffs' allegations with respect to the NFL Defendants' supposed intent are patently deficient.[13]

## B. Plaintiffs Do Not Sufficiently Plead But-For Causation

Separately, Plaintiffs fail to—and indeed cannot—allege that race or racial demographic normative adjustments were the "but for" cause of their alleged injuries, as required to state a Section 1981 claim. *Comcast*, 140 S. Ct. at 1019.

First, Mr. Davenport's claim has *never* been denied by the Claims Administrator—it has been remanded for further consideration. (Special Masters' Determination at 1–2.)[14] As the Special Masters held in remanding Mr. Davenport's claim, a clinician's mere failure to use a race-based adjustment should never be the sole basis for a claim's denial. (*Id.* at 11.) As such, the

---

[13]  Because Federal Rule of Civil Procedure 8(a)(2) requires a showing, rather than a blanket assertion, of entitlement to relief, courts evaluating the viability of a complaint under Rule 12(b)(6) must look beyond conclusory statements and determine whether the complaint has alleged enough facts to state a claim to relief that is plausible on its face. *Renfro* v. *Unisys Corp.*, 671 F.3d 314, 320 (3d Cir. 2011). "Indeed, it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts 'to raise a right to relief above the speculative level.'" *Bakkali* v. *Walmart, Inc.*, No. 20-cv-3440, 2020 WL 5517350 at *2 (E.D. Pa. Sept. 14, 2020) (quoting *Umland* v. *Planco Financial Services, Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Examination of the context of the claim, including the underlying substantive law is therefore necessary in order to properly assess plausibility." *Id.* (citing *Ashcroft*, 556 U.S. at 678).

[14]  Furthermore, the claim determination was appealed by the NFL Defendants on grounds other than the use of normative adjustments. (Special Masters' Determination at 1–2.)

Complaint alleges no cognizable injury suffered by Mr. Davenport, much less one where race-based demographic adjustments were the "but for" cause.

Second, while Mr. Henry alleges that the Claims Administrator denied his claim (based on a 2017 diagnosis by a MAF Physician), the Complaint alleges nothing about the basis for that denial, much less that racial normative adjustments were the "but for" cause of the denial. (*See* Compl. ¶ 6.) Mr. Henry also claims that, in a 2019 evaluation, an unnamed clinician applied racial demographic adjustments and determined that his test scores did not qualify for a compensable Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment. (*Id.*) But the Complaint does not allege—as it must—that Mr. Henry would have merited a Qualifying Diagnosis if race-based demographic adjustments had not been used, or that the clinician felt obligated to make those adjustments against his or her better clinical judgment based on the terms of the Settlement Agreement, the Clinician's Interpretation Guide, or the deliberate conduct of the NFL Defendants. The Complaint is silent on each of these issues, which are independently necessary to plead—and later prove—that race discrimination was the "but for" cause of Mr. Henry's failure to merit a Qualifying Diagnosis under the terms of the Settlement Agreement.[15]

*     *     *

In sum, the Settlement Agreement's permissive use of race-based normative adjustments in furtherance of diagnostic accuracy—a Settlement term that Plaintiffs had an

---

[15] Moreover, and critically, the limited ways in which independent clinicians might use racial considerations in connection with neurocognitive testing was evident on the face of the proposed Settlement Agreement. By not objecting or appealing on the basis of these features, Plaintiffs and all other Settlement Class Members tacitly agreed to them. Thus, there is no violation of the "right . . . to make and enforce contracts"—this is the agreement Plaintiffs and the Class voluntarily signed onto and thus there has been no interference whatsoever with their right to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981.

opportunity to, but did not, object to in the course of its final approval—does not support the

pleading of a Section 1981 claim as a matter of law, and the claim should be dismissed.[16]

## **CONCLUSION**

For the foregoing reasons, the NFL Defendants respectfully submit that the

Complaint should be dismissed in its entirety, with prejudice.

---

[16] Although the NFL Defendants believe this case is ripe for immediate dismissal, in the alternative they respectfully move the Court to hold this case in abeyance pending decision on Plaintiffs' Motion for Relief, which will be fully briefed by November 12, 2020 and is based on the same stated grounds as those alleged in the Complaint. "A United States district court has broad power to stay proceedings," a power that is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Bechtel Corp.* v. *Local 215, Laborer's Int'l. Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976) (quoting *Landis* v. *N. Am. Co.*, 299 U.S. 248, 254–55 (1936)). When deciding a motion to stay, a court typically looks to three factors: "(1) the promotion of judicial economy; (2) the balance of harm to the parties; and (3) the duration of the requested stay." *Dennis* v. *Trans Union, LLC*, No. 14-cv-2865, 2016 WL 127453, at *2 (E.D. Pa. Jan. 12, 2016) (quoting *Cirulli* v. *Bausch & Lomb, Inc.*, No. 08-cv-4579, 2009 WL 545572, at *2 (E.D. Pa. Mar. 4, 2009)). Judicial economy would clearly be served if this case is held in abeyance pending this Court's determination of the Motion which, as noted, is founded in the same allegations. There is no possibility that this would harm Plaintiffs; to the contrary it would save all Parties—and the Court— both time and unnecessary expense. It also would ensure the involvement of Class Counsel—appointed by this Court to represent Plaintiffs here and the uncertified class they seek to represent—who negotiated the terms at issue on behalf of Retired NFL Football Players, because they are participating in the briefing on the Motion for Relief. A stay of the action would only be temporary, until the Motion is decided.

Dated: November 2, 2020

Respectfully submitted,

*/s/ Brad S. Karp*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp *(admitted pro hac vice)*
Bruce Birenboim *(admitted pro hac vice)*
Claudia Hammerman *(admitted pro hac vice)*
Lynn B. Bayard *(admitted pro hac vice)*
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000

TROUTMAN PEPPER LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing document was served electronically via the Court's electronic filing system on the 2nd day of November, 2020, upon all counsel of record.


Dated:  November 2, 2020

_____/s/ Brad S. Karp_____
Brad S. Karp